UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:11-cr-00184-JAW-1 |
| | ) | |
| MARK RAZO, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON AMENDED MOTION FOR COMPASSIONATE RELEASE**

An inmate serving a three-hundred-month sentence for organizing a national drug distribution operation, moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), citing his career offender status, youth, and support network.  The Court considered the defendant's arguments for compassionate release and determined that they do not constitute extraordinary and compelling reasons justifying release.  The Court also weighs the section 3553(a) factors against release in light of the seriousness of his offenses, the time he has served in relation to the imposed sentence, and the need for the sentence that he serves to fulfill the purposes of the law.

## I.   BACKGROUND

The Court assumes that the parties are familiar with the factual and procedural background of this case as it has surpassed three hundred docket entries.  On March 1, 2013, Mark Razo was convicted by a jury on three counts of unlawful use of a communications facility and one count of conspiracy to distribute and possess with intent to distribute a controlled substance.  *Jury Verdict Form* (ECF No. 158).

On September 17, 2013, he was sentenced to 48 months imprisonment on each of the communications facility counts and 300 months imprisonment on the conspiracy count, to be served concurrently; one year of supervised release on each of the communications facility counts and six years of supervised release on the conspiracy count, also to be served concurrently; and a $400 special assessment.  *J.* (ECF No. 199).  Mr. Razo appealed his convictions and sentence, which were affirmed by the Court of Appeals for the First Circuit on April 1, 2015.  *United States v. Razo*, 782 F.3d 31 (1st Cir. 2015).

On March 28, 2016, Mr. Razo filed a motion to vacate, set side, or correct his sentence, *Appl. for Leave to File a Second or Successive Mot. to Vacate, Set Aside or Correct Sentence* (ECF No. 269), but later moved to voluntary withdraw that motion and the Court dismissed it without prejudice.  *Voluntary Withdrawal of 2255 Filing and Dismissal Without Prejudice* (ECF No. 287); *Order Granting Mot. to Dismiss 2255 Without Prejudice as to Mark Razo* (ECF No. 288).  On November 19, 2020, Mr. Razo filed a motion to reduce his sentence, *Mot. to Reduce Sentence* (ECF No. 296), and on November 23, 2020, the Court denied that motion.  *Order Regarding Mot. for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2)* (ECF No. 297).

On March 18, 2022, Mr. Razo filed a motion for compassionate release under the First Step Act.  *Mot. for Compassionate Release re: First Step Act* (ECF No. 302).  On March 23, 2022, the Court appointed counsel for Mr. Razo.  *Appointment of Counsel & Scheduling Order* (ECF No. 305).  On August 8, 2022, Mr. Razo amended his motion for compassionate release.  *Am. Mot. for Compassionate Release* (ECF No.

312) (*Def.'s Mot.*).   On October 17, 2022, the Government responded to Mr. Razo's motion.   *Gov't's Obj. to Def.'s Am. Mot. for Compassionate Release* (ECF No. 319) (*Gov't's Opp'n*).   Finally, on October 25, 2022, Mr. Razo filed a reply in support of his motion.   *Reply to the Gov't's Obj. (Dkt. 319) to Razo's Am. Mot. for Compassionate Release* (Dkt. 312) (ECF No. 321) (*Def.'s Reply*).

## II.   THE PARTIES' POSITIONS

### A.   Mark Razo's Amended Motion for Compassionate Release

Mr. Razo's forty-one-page memorandum lists several reasons for his motion, focusing primarily on his career offender status, youth, and network of support.   *Def.'s Mot.* at 1-41.   He asks the Court to release him from prison reduce his sentence, and/or "remov[e] the leader/organizer enhancement, even if it does not ultimately alter the carceral term."   *Id.* at 40.

Mr. Razo recounts in detail the factual background of his case and the development of the sentencing guidelines since his conviction.   *Id.* at 1-14.   He observes that, as of August 2022, he has served about ten and a half years of his 25-year sentence and urges the Court to discount his prison disciplinary record, offering that "[w]ithout more information [about the infractions], it is impossible to conclude that these transgressions reflect obstreperousness as opposed to the rough-and-tumble reality of federal prison."   *Id.* at 19.

Mr. Razo asserts three extraordinary and compelling reasons he believes justify sentencing relief: (1) that he does not meet the criteria in effect today for career offender status; (2) his youth; and (3) his network of support.   *Id.* at 24-36.   Regarding

3

his career offender status, Mr. Razo submits that, due to intervening caselaw and the United States Sentencing Commission redefining "a crime of violence", he would not have met the criteria for the career offender enhancement if sentenced today. *Id.* at 13-14. He acknowledges, however, that "[i]t is true that even without career offender status, [his] advisory Guideline range would remain 360 months to a lifetime of imprisonment." *Id.* at 24.

Instead, he focuses on the Court's statements at sentencing that it was "troubled" by Mr. Razo's "highly unusual" career offender status. Id. at 24-25. Mr. Razo states that he "apologizes if he has misinterpreted the sentiment expressed on the record, but it seems that perhaps this Court understandably believed that it was obligated to apply the career offender enhancement since Mark met the then-criteria" and that "we now know that the career offender enhancement need not have applied and, without it, perhaps this Court would have departed downward even more." *Id.* at 26-27. Mr. Razo concludes that "[t]o the extent that [his] career offender designation caused this Court to presume that a lengthy prison sentence was penologically appropriate for him as a repeat violent offender, extraordinary and compelling reasons – namely, the fact that he no longer meets the criteria in effect today – merit sentencing relief." *Id.* at 28.

Next, Mr. Razo turns to the fact that he "was only 22 years old when he committed the instant offense" and the Court's remark at sentencing that he was "just too young" to receive a 360-month sentence. *Id.* at 29. He submits that because he "was so young when he committed the instant offense, he has an uncommon

capacity for reformation." *Id.* He adds that "assumptions about incapacitation and recidivism that existed when Mark was sentenced have now been debunked (and without belaboring the point, career offender status may have exaggerated this Court's thinking about these things)" and offers that "[t]his is even more true for youthful offenders." *Id.* at 32. Mr. Razo also submits that he had "boundless potential" before his conviction and has completed more than 50 educational courses while incarcerated. *Id.* at 33-34.

The third factor Mr. Razo offers in support of his release is his strong network of support. *Id.* at 34. He states that multiple family members stand ready to help him, hire him, and provide him a place to live. *Id.* at 34-35. He adds that his sister is disabled and his mother, who cares for his sister, suffers from "very poor health" and they "both pray for [his] release so he can ease his mother's burden." *Id.* at 36.

Turning to the 18 U.S.C. § 3553(a) factors that he believes justify release, Mr. Razo asserts that "[his] status as a career offender played a significant role in this Court's evaluation of his history and characteristics" and they should now be viewed in a "new light," mitigating "strongly in his favor." *Id.* at 36-37. He adds that the decade he has already served sufficiently reflects the seriousness of the offenses and that "an additional 15-years of incapacitation overshoots what is necessary to protect the public and reform [him]." *Id.* at 38. Finally, Mr. Razo asserts that "[w]ith the strong support of his family, [he] can become a productive member of society" and "[t]he best way to provide [him] with needed training is to permit him the opportunity to work and learn in the community." *Id.* at 39.

### B.     The Government's Response

The Government disagrees.    It responds that "[n]one of [Mr. Razo's justifications] are extraordinary and compelling reasons warranting the defendant's release . . . [and f]urther, an analysis of the 18 U.S.C. § 3553(a) factors do not support his request."  *Gov't's Opp'n* at 1.

At the outset, it calculates that, as of October 2022, Mr. Razo had served roughly 47% of his sentence.  *Id.* at 2.  He "had nine separate disciplinary actions in prison between 2015 and 2020 . . . [and f]ive of those offenses were classified as 100 level (most serious offenses)."  *Id.*  The offenses "include possessing drugs/alcohol, destroying/disposing of items, fighting, possessing a dangerous weapon, refusing to obey an order, engaging in a group demonstration, interfering with a security device, and assault."  *Id.*

The Government rejects Mr. Razo's suggestion that, absent the career offender designation, the Court would have imposed a shorter sentence.  *Id.* at 3.  It observes that—as Mr. Razo has acknowledged—the designation had no effect on the guideline range, the Court departed 60 months below the low end of the guidelines, and "the government believes that the defendant has completely misinterpreted the court's view on the defendant's career offender status at the time of his sentencing."  *Id.* at 3-4.  It interprets the Court's remark that it was "troubled" by the designation to indicate not that "the court believed it compelled the court to impose a lengthier sentence than it would have otherwise" but instead that the Court "appear[ed] to discount the significance of the defendant's career offender status in rendering a

sentence that, again, was five years below the low end of the applicable guidelines range." *Id.* at 4.

Turning to Mr. Razo's argument about his youth, the Government submits that "a non-juvenile defendant's young age does not present an extraordinary and compelling reason to reduce a sentence . . . [and t]he defendant does not cite and the government has been unable to find any case granting compassionate release for this reason." *Id.* It adds that "following the defendant's logic, compassionate release would be available to any defendant who committed a crime before his adolescent brain had matured in his mid-20's" and "[f]urther, the defendant's youth was explicitly considered by the court at sentencing and contributed, in part, to the defendant's non-guidelines sentence." *Id.* Regarding Mr. Razo's network of support, the government counters that "the defendant does not cite and the government has been unable to find any case granting compassionate release for this reason" and that while "[m]any defendants have a strong network of support available to them when they leave prison . . . It does not present an extraordinary and compelling reason to reduce a sentence." *Id.* at 5.

Finally, the Government submits that, even if Mr. Razo had offered extraordinary and compelling reasons justifying release, the § 3553(a) factors would not warrant release because: (1) Mr. Razo already had a criminal record and has had repeated disciplinary infractions while incarcerated; (2) his crimes were extremely serious; (3) the Court already imposed a below-guidelines sentence and Mr. Razo has

served less than half of it; and (4) Mr. Razo and the public must be put on notice that serious drug trafficking offenses come with serious consequences. *Id.* at 5-6.

### C. Mark Razo's Reply

In reply, Mr. Razo reiterates that he would not be considered a career offender if sentenced today and submits that "[t]o the extent that such assumptions impacted [his] sentence – and it is difficult to imagine that they did not in some aggravating way – then this augurs in favor of a sentencing recalibration now." *Def.'s Reply* at 3. He adds that "this Court considered [his] youth at sentencing and found it to be mitigating – and for this [he] is genuinely grateful," suggesting that "[i]n many ways, this Court's treatment of [his] age at sentencing was cutting-edge." *Id.* at 4. He offers that, nonetheless, "[s]imilar to [his] argument about career-offender status, these new developments suggest that [his] young age is even more mitigating now than it was at the time of his sentencing," especially where "this Court has the great benefit of seeing how [he] has matured while in prison." *Id.* at 4-5.

Mr. Razo contends further that "age is, without question, a legitimate basis for granting compassionate release" and that *United States v. Ruvalcaba*, 26 F.4th 14, 26 (1st Cir. 2022) dictates that "[t]his Court must decide whether [he] has demonstrated unusual maturity, and the fact that he has successfully completed so many training programs while incarcerated strongly suggests that he has." *Id.* at 5-6. Mr. Razo reiterates that his network of support and the § 3553(a) factors favor release and submits that, while the government points to his disciplinary record while incarcerated, "these incidents lack context – and the government has supplied none

– so this Court should afford them little weight." *Id.* at 9-10. He concludes that [i]f this Court is not inclined to reduce [his] prison sentence, then removing the leader/organizer enhancement will enable the BOP to reclassify him so that he may serve the remainder of his time in a less stressful prison environment." *Id.* at 10.

## III. LEGAL STANDARD

"Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when 'extraordinary and compelling reasons warrant such a reduction.'" *Ruvalcaba,* 26 F.4th at 18. "To grant the motion, the district court must find both that the defendant has presented an 'extraordinary and compelling' reason warranting a sentence reduction, . . . and that 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *Id.* at 18-19 (quoting § 3582(c)(1)(A)).

The United States Sentencing Commission's current policy guidance[1] for addressing compassionate release motions brought by the Director of the BOP, issued pursuant to Guideline § 1B1.13, "was last modified in November of 2018—before the F[irst] S[tep] A[ct] (FSA) amended the compassionate-release statute to allow for prisoner-initiated motions." *Id.* at 20. In *Ruvalcaba*, the First Circuit resolved that district courts are not constrained by the Sentencing Commission's 2018 policy statement in adjudicating prisoner-initiated motions for compassionate release. *Id.*

---

[1]      The Sentencing Commission's list of "four categories of extraordinary and compelling reasons: medical conditions; age; family circumstances; and a catch-all for other reasons deemed appropriate by the BOP. . . remains unchanged today." *Ruvalcaba*, 26 F.4th at 20 (citing U.S.S.G. § 1B1.13 cmt. n.1 (A) – (D)). "[S]ection 1B1.13 also requires a finding that the defendant is not dangerous in order to grant compassionate release based on extraordinary and compelling reasons." *Id.* at 19-20 n.5.

at 22-23 (emphasizing that § 603(b) of the FSA "effected a paradigm shift in how compassionate release would function" and that "[g]iven the profound nature of this paradigm shift, it is fair to say that the 'purposes' and 'appropriate use' of the compassionate-release statute have swelled beyond those that inhered in the statute when the Sentencing Commission issued its original policy statement").

The First Circuit clarified that the absence of an applicable policy statement does not leave the district court's discretion "unbounded," rather it remains "circumscribed by statutory standards, which obligate the district court to find a reason that is both 'extraordinary and compelling.'" *Id.* at 23 (citing *United States v. Canales-Ramos*, 19 F.4th 561, 566 (1st Cir. 2021) ("[T]he 'extraordinary and compelling' standard is logically guided by the plain meaning of those terms")). "[M]oreover, the current policy statement—though not 'applicable'—nonetheless may serve as a non-binding reference." *Id.*

Thus, until the Sentencing Commission updates its guidance applicable to prisoner-initiated motions, "the district courts will have to assess prisoner-initiated motions for compassionate release primarily through the lens of the statutory criteria." *Id.* "Ultimately, . . . it is within the district court's discretion—constrained only by the statutory criteria[2] and any applicable policy statement—to make that [individualized assessment of a myriad of factors], case by case." *Id.* at 27-28. A court

---

[2]      The only "explicit limitation on what may comprise an extraordinary and compelling reason" is "that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" *Id.* at 25 (alterations in *Ruvalcaba*) (quoting 28 U.S.C. § 994(t)).

"may consider any complex of circumstances raised by a defendant as forming an extraordinary and compelling reason warranting relief." *Id.* at 28.

If the prisoner meets the extraordinary and compelling circumstances standard necessary to justify compassionate release, "the district court must [also] consider any applicable section 3553(a) factors," *id.* at 19, to "determine whether, in its discretion, the reduction . . . is warranted in whole or in part under the particular circumstances of the case." *United States v. Saccoccia*, 10 F.4th 1, 4 (1st Cir. 2021) (omission in *Saccoccia*). In particular, before granting the petition, a court must assess,

> [t]he nature and circumstances of the offense and the history and characteristics of the defendant, the need . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; [and] to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). "Though the [§] 3553(a) factors may serve as an independent basis for a district court's decision to deny a compassionate-release motion," they "need only be addressed if the court finds an extraordinary and compelling reason favoring release." *Saccoccia*, 10 F.4th at 8.

The movant bears the burden of proving that he is entitled to a sentence reduction, and the Court has discretion to determine whether "the reduction . . . is warranted in whole or in part under the particular circumstances of the case." *United States v. Texeira-Nieves*, 23 F.4th 48, 52 (1st Cir. 2022) (quoting *Saccoccia*, 10 F.4th at 4); *see Saccoccia*, 10 F.4th at 4 (stating that the First Circuit's standard of review

"[r]ecogniz[es] that the compassionate-release statute provides that a district court's decision to grant or deny a compassionate-release motion is discretionary").

## IV.   DISCUSSION

Mr. Razo has not offered extraordinary or compelling reasons justifying relief and, moreover, the § 3553(a) factors weigh against release. The Court already discounted his career offender designation and considered his youth in fashioning his sentence. His network of support is encouraging but does not constitute an extraordinary circumstance. Mr. Razo has served less than half of his sentence and his disciplinary record while incarcerated is not encouraging. The Court denies his motion but does not shut the door on a future motion for compassionate release, once he has served a greater percentage of his original sentence and assuming his disciplinary problems do not reemerge. While the Court has the authority to reduce his sentence, it finds a potential future release would be preferable, because a reduction predicts his future course in prison and a release is based on his known behavior while incarcerated and its impact on his risk of recidivism.

### A.   Extraordinary and Compelling Reasons

To grant Mr. Razo's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence. Mr. Razo offers three possible factors: his career offender status, age, and support network. None is availing.

#### 1.   Career Offender Status

At his sentencing hearing, Mr. Razo objected to the Probation Office's determination that he qualified for career offender status under U.S.S.G. § 4B1.1. *Tr. of Proceedings, Sentencing Proceedings*, 24:13-29:17 (ECF No. 234) (*Sentencing Tr.*). After discussing the criteria for application of career offender status and applying *Sykes v. United States*, 564 U.S. 1 (2011), the Court determined that Mr. Razo qualified for career offender status. *Id.* 29:14-17.  Mr. Razo appealed this guideline determination to the Court of Appeals for the First Circuit and on April 15, 2015, the First Circuit rejected Mr. Razo's challenge to the career offender conclusion. *United States v. Razo*, 782 F.3d 31, 37-38 (1st Cir. 2015).  As the First Circuit rejected Mr. Razo's challenge to his guideline status as a career offender, Mr. Razo does not contend, nor could he contend, that the Court erred in its original guideline finding of career offender status.

Instead, Mr. Razo observes that even if the Court correctly concluded that Mr. Razo met the criteria for career criminal status under the guidelines as they existed in 2013, the guidelines changed in 2016 to ease the standards for career criminal status. *See Def.'s Mot.* at 13 (citing U.S.S.G. App. C, amend. 798 (Supp. Nov. 1, 2016)). As of September 2013, Mr. Razo had two prior convictions: a controlled substance offense for which he had been sentenced to three years incarceration and an evading officer against traffic offense for which he had been sentenced to sixteen months incarceration. *Presentence Investigation Report* ¶¶ 25-26 (*PSR*).  The controlled substance offense would still count as a career offender predicate, but the evading officer against traffic offense would not. *See Def.'s Mot.* at 13-14.  Thus, if Mr. Razo

13

had been sentenced under the version of the guidelines in effect three years after his sentencing hearing, Mr. Razo argues that he would not have been classified as a career offender.

For guideline purposes, however, it does not matter, because he would have faced the same guideline sentence range regardless of whether he qualified for career offender status. This is because Mr. Razo was convicted of committing the federal offense set forth in Count IV, conspiracy to distribute and possess with the intent to distribute controlled substances, which carried a minimum term of imprisonment of twenty years and a maximum term of life. *See PSR* ¶¶ 47-48. Thus, Mr. Razo concedes that even if he would not qualify as a career offender if sentenced today, this distinction would have no impact on his guideline sentence range. As Mr. Razo acknowledges, "[i]t is true that even without career offender status, [his] advisory Guideline range would remain 360 months to a lifetime of imprisonment." *Def.'s Mot.* at 24. In other words, even with the career designation removed, the 300-month sentence imposed by the Court would still be well below the bottom of the guideline range.

Recognizing that the 2016 change in the guidelines did not affect his guideline sentence range, Mr. Razo presses a more nuanced point. He postulates that the Court's classification of Mr. Razo as a career offender was a pejorative and negatively influenced the Court, leading it to impose a harsher sentence. Mr. Razo points to the Court's statements at sentencing that it was "troubled" by the designation to suggest that "this Court understandably believed that it was obligated to apply the career

14

offender enhancement since [he] met the then-criteria" and/or "mean that [the] career offender status impacted the number of years that this Court was willing to depart from the minimum Guideline range." *Id.* at 24, 27. The Government, by contrast, interprets the Court's remarks as "discount[ing] the significance of the defendant's career offender status in rendering a sentence that, again, was five years below the low end of the applicable guidelines range." *Gov't's Opp'n* at 4.

The Government's interpretation is on the mark. At the sentencing hearing, the Court mentioned that it was "troubled by the fact that the defendant's two convictions - - and there are only two - - are two convictions that merit career offender status." *Sentencing Tr.* 29:24-30:1. As the PSR revealed, by strict numerical computation, Mr. Razo would have been a criminal history category IV because he had a criminal history score of 8.[3] As calculated by the PO, Mr. Razo's criminal history category was increased to VI because of his career offender status. *PSR ¶ 28.*

---

[3] Mr. Razo was arrested on December 26, 2009 for possession for sale of a controlled substance and was sentenced on May 7, 2010 to three years of incarceration. *PSR ¶ 25.* The PO imposed three points for that conviction. *Id.* On April 21, 2010, he was arrested for evading officer against traffic and on May 7, 2010, was sentenced to 16 months of incarceration. *Id. ¶ 26.* He received three points for this second conviction, totaling six criminal history points. *Id. ¶ 26, 28.* As he committed the federal crime while under a criminal justice sentence, his criminal history score was increased by two points. *Id. ¶ 27.* His total criminal history score was eight, which would have rendered a criminal history category of IV.

By virtue of his career offender status, however, his criminal history category was increased to VI. U.S.S.G. § 4B1.1(b) ("A career offender's criminal history category in every case under this subsection shall be Category VI"). Even if he had not been deemed a career offender, Mr. Razo had a total offense level of 42, which with a criminal history category of IV, would have resulted in a guideline range of incarceration of 360 months to life. U.S.S.G. Part A (2013).

In his memorandum, Mr. Razo points out that if current guideline provisions applied to Mr. Razo, his base offense level would have been 36, not 38 (and thus his total offense level 40 rather than 42), but he concedes that he would still have been subject to a guideline sentence range of 360 months to life imprisonment. *Def.'s Mot.* at 7-8. This is because a total offense level of 40 and a criminal history category of IV still results in a guideline sentence range of 360 months to life. U.S.S.G. Part A. To have any impact on the 360 months to life guideline range, Mr. Razo would have had to be successful not only in deflecting career offender status, but also in arguing against the four-level enhancement the Court imposed for being an organizer or leader under U.S.S.G. § 3B1.1(a). As the

What "troubled" the Court was that the career offender classification, as the name implies, is more usually applied to someone who has made a career out of committing serious crimes. The Court commented that more typically, before reaching career offender status, a defendant presents with "a series of convictions leading up to the two convictions that qualify. But here, the defendant had the misfortune of having the only two convictions be predicate convictions for purposes of career offender status." *Sentencing Tr.* at 30:2-5. In Mr. Razo's case, career offender status was applicable to a defendant who was unusually young and who had been convicted of only two crimes, thus career offender status, though applicable, seemed unduly harsh given Mr. Razo's age and prior criminality. Nevertheless, as Mr. Razo conceded, even if career offender status had not been imposed, he still would have faced a 360 month to life guideline sentence because his total offense level would have been 42, and with a total offense level of 42 and a criminal history category of IV, the guideline range remains 360 months to life.

Here, Mr. Razo had two prior convictions arising from his actions when he was 20 and 21 years old, and the Court therefore discounted the career offender designation because of his young age and comparative absence of other prior criminal history. To the extent that Mr. Razo is now arguing he should be granted compassionate release because of his career offender status influenced the Court to impose a harsher sentence than it otherwise would have done, the Court rejects his

Court explained at the sentencing hearing and elsewhere, the evidence that Mr. Razo was an organizer or leader of this conspiracy is overwhelming, and there is no reason for the Court to revisit its organizer or leader determination, a result compelled by the evidence in his case.

argument as factually incorrect.  The Court's assessment of his career offender status led it to impose a much more lenient sentence than the one called for in the guidelines.

This does not mean that the Court cannot reassess its 300-month sentence in determining whether Mr. Razo has demonstrated extraordinary and compelling reasons for his early release.  It only means that Mr. Razo's arguments about career offender status do not sustain his burden to prove extraordinary and compelling reasons justifying release.

### 2.     Youth

Similarly, to the extent that Mr. Razo contends that his youth is an extraordinary reason justifying a sentence reduction,[4] the Court already considered his youth at sentencing in imposing a sentence significantly below the guideline range.  *See Sentencing Tr.* at 109-10 ("[I]t just seems to me that 30 years in prison for someone 24 years old [who] committed the crimes, for the most part, between the time he was 20 to 22 is not consistent with the court's sense of proportionality, and I – although I'm concerned about what you may be doing in the future, I don't want to

---

[4]      The parties dispute whether a defendant's youth can present an extraordinary or compelling reason for relief.  *See Gov't's Opp'n* ("Simply put, a non-juvenile defendant's young age does not present an extraordinary and compelling reason to reduce a sentence" and "[t]he defendant does not cite and the government has been unable to find any case granting compassionate release for this reason"); *Def.'s Reply* at 7 ("*Ruvalcaba* refutes both the government's notion that a non-juvenile offender's age is never relevant and the notion that compassionate release is warranted only if a defendant can point to some *other* defendant who has received compassionate release for a similar reason.").  In this case, at least, it does not.

The Court is not required to resolve whether under *Ruvlacaba*, it could grant a motion for compassionate release solely based on Mr. Razo's youth.  It assumes that it has the authority to do so, since youth is part of a defendant's history and characteristics under § 3553(a).  The Court also assumes that even though at the September 16, 2013 sentencing hearing, it substantially reduced Mr. Razo's sentence due to his youth, it would have the authority under § 3582(c)(1)(A) to further reduce his sentence, if convinced to do so.  Here, for the reasons it describes, the Court does not conclude that Mr. Razo qualifies under § 3582(c)(1)(A) for compassionate release.

foreclose the future from you . . .. So I'm going to impose a sentence that is less than the bottom of the guideline"). Mr. Razo has not produced—nor has the Court been able to find—any caselaw suggesting that a non-juvenile defendant's youth alone can constitute an extraordinary or compelling circumstance, especially since a defendant's age would have been apparent at the sentencing hearing and under the guidelines, a defendant's youth may be relevant in determining whether a departure is warranted. *See* U.S.S.G. § 5H1.1 (policy statement). Even if such a case existed, the Court does not find youth extraordinary or compelling here, where it already considered Mr. Razo's youth when fashioning a below-guidelines sentence "consistent with the court's sense of proportionality" for a person his age. *Id.*

For purposes of compassionate release, it seems to the Court that Mr. Razo's age should work differently than is being proposed. As just noted, the Court already considered his youth in imposing a sentence substantially below the calculated guideline, based in part on his youth. But Mr. Razo is now thirty-four years old, and he is presumably not just older, but wiser, having spent years of his life in both state and federal prison. Mr. Razo's better argument is that he has aged out of criminal conduct and no longer presents the same risk of recidivism that he may have when he was twenty-four. The Court addresses this aspect of the youth argument in its evaluation of the § 3553(a) factors.

### 3. Network of Support

Finally, Mr. Razo offers that he has a network of support prepared to offer him housing and employment. *Def.'s Mot.* at 34-35. The Government again rejoins that

"the defendant does not cite and the government has been unable to find any case granting compassionate release for this reason" and "[m]any defendants have a strong network of support available to them when they leave prison [but i]t does not present an extraordinary and compelling reason to reduce a sentence." *Gov't's Opp'n* at 4-5.  In reply, Mr. Razo responds that this is "not the *only* reason [he] cites in support of his amended motion, and there are no shortage of cases where a movant's strong support network is one of several justifications for granting release." *Def.'s Reply* at 8 (collecting cases) (emphasis in original).

The Court is heartened by Mr. Razo's support network and believes it will greatly assist his eventual reintegration into the community, but the presence of a support network does not on its own justify compassionate release.  Indeed, Mr. Razo's mother, aunt and the mother of his child all spoke at his September 2013 sentencing hearing and offered similar testimonials about Mr. Razo's good nature, intelligence, the impact his poor choices had had on his family, and their willingness to support him upon release. *Sentencing Tr.* at 4:6-12:3.  The Court considered these family statements when it originally imposed the sentence.

As noted, the current letters from family members in support of his motion for compassionate release are encouraging and bode well for Mr. Razo's rehabilitation upon his release from incarceration, especially the willingness of some family members to offer Mr. Razo employment upon his release, but in the Court's view, they do not present extraordinary and compelling reasons for release.

### 4. Conclusion

Mr. Razo has not offered any extraordinary or compelling reasons justifying relief and for that reason his motion must be denied.

### B. The Section 3553(a) Factors

Even if Mr. Razo had presented extraordinary and compelling reasons, the Court must also consider the factors set forth in 18 U.S.C. § 3553(a), including "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

As the Court stated at Mr. Razo's sentencing, his conduct was egregious, working "substantially up in the food chain" in a national conspiracy to distribute large quantities of drugs—including methamphetamine, cocaine, and heroin— "extremely addictive and harmful to society." *Sentencing Tr.* at 103-04. Moreover, he "organize[d] and effectuate[d] this drug-trafficking conspiracy even while he was in prison for drug trafficking in California" and "his willingness to continue to deal drugs out of prison . . . reflect[ed] a disrespect for the law." *Id.* at 104-05. The PSR reflects that even though he was in California state prison, Mr. Razo was a major supplier to Barry Diaz, who was himself a prolific drug dealer.[5] Not including Mr.

---

[5]     On January 15, 2015, the Court sentenced Barry Diaz, Mr. Razo's co-defendant, to 270 months of incarceration, six years of supervised release, and a $200 special assessment. *J.* (ECF No. 257). Mr. Diaz faced a guideline sentence range of 324 to 405 months. *See Ct. of Appeals for the First Circuit, J.* at 1-2 (ECF No. 268). The Court therefore reduced Mr. Diaz's sentence a total of fifty-four months below the guideline range, six months fewer than it reduced than Mr. Razo's, even though Mr. Diaz pleaded guilty, received a three-level reduction for acceptance of responsibility, entered into a plea agreement with the Government, had a slightly lower criminal history category of V, and had exhibited

Diaz, Mr. Razo's PSR lists eleven related cases of individuals who were involved in the Razo drug trafficking conspiracy. *PSR* at 2. From his California state prison, Mr. Razo was intermediating the distribution of illegal drugs not merely in Maine, but also in Iowa, Arizona, Connecticut, and California. *Id.* ¶ 5-7. From his prison, Mr. Razo was able to engage, designate, and direct couriers, often young females, for the drug shipments and deliveries. *Id.* ¶¶ 6-8. At his sentencing hearing, the Court described Mr. Razo's ability to "organize and effectuate this drug-trafficking conspiracy" while in California prison as "highly unusual," but also noted that it showed a "disrespect for law." *Sentencing Tr.* at 104:18-105:12. The Court observed that "[i]f you're in prison, in part, because you're dealing drugs, if you continue to deal drugs, you certainly haven't gotten the message." *Id.* at 105:12-14. In short, Mr. Razo's participation in this drug-dealing conspiracy was particularly heinous and egregious, given its complexity, national scope, drug quantity, and Mr. Razo directing from prison, and the seriousness of his crimes merited a serious sentence.

Mr. Razo has now served roughly half of his 300-month sentence. *See Gov't's Opp'n* at 1-2 (as of March 23, 2022, Mr. Razo had served "approximately 47.2% of his sentence"). The Court is troubled by his disciplinary record while incarcerated. He has had nine separate disciplinary actions between 2015 and 2020—five classified at the level of "most serious offenses"—including possessing drugs/alcohol, destroying/disposing of items, fighting, possessing a dangerous weapon, refusing to obey an order, engaging in a group demonstration, interfering with a security device,

---

impressive post-conviction rehabilitation. *See Sentencing Proceedings, Tr. of Proceedings* (ECF No. 267).

and assault.[6]  *Id.* at 2; *see Mem. from Probation Officer Jennifer Metcalfe to Hon. John A. Woodcock, Jr.* at 1 (3/23/2022) (ECF No. 304).  Mr. Razo acknowledges that, while incarcerated, he has been in two fights and was reprimanded for possessing a dangerous weapon but submits that "records do not elucidate the circumstances that gave rise to these infractions" and "[w]ithout more information, it is impossible to conclude that these transgressions reflect obstreperousness as opposed to the rough-and-tumble reality of federal prison."  *Def.'s Mot.* at 18-19.  While he contends that these records are vague, Mr. Razo had the opportunity to explain the circumstances surrounding these infractions yet chose not to.

The Court disagrees with Mr. Razo that his poor disciplinary record is simply a reflection of the "rough-and-tumble reality" of federal prison.  *Def.'s Mot.* at 19.  In ruling on compassionate release motions, sentences for repeat offenders, and petitions for revocation of supervised release, the Court has reviewed countless BOP disciplinary records, and the Court rejects Mr. Razo's argument that his ten separate disciplinary actions are typical of average federal inmates.  Many federal inmates, who seek compassionate release, present spotless disciplinary records.  Instead, the Court views Mr. Razo's persistent disciplinary problems as a mark against his compassionate release because if he cannot behave himself in the strict structure of

---

[6]    To its October 22, 2022 opposition, the Government attached a copy of Mr. Razo's then BOP disciplinary record: 1) August 16, 2015 – assaulted another inmate; 2) November 14, 2016 – destroying contraband and refusing an order; 3) November 16, 2016 – blocking a locking device and refusing an order; 4) December 20, 2016 - encouraging others to riot and refusing an order; 5) January 4, 2017 – refusing an order; 6) February 27, 2017 – possessing a dangerous weapon; 7) May 22, 2017 – possessing a dangerous weapon; 8) February 8, 2019 – possessing drugs or alcohol; 9) April 22, 2020 – fighting with another inmate; and 10) July 30, 2020 - possessing drugs or alcohol and destroying or disposing of an item during a search.  *Gov't's Opp'n* Attach. 2, *Inmate Discipline Data* at 1-4.

a federal prison, it does not bode well for his self-discipline upon his release to society.[7]

Overall, the Court concludes that Mr. Razo has not offered extraordinary or compelling reasons justifying relief and, regardless, release at this point would fail to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence. To the extent that Mr. Razo requests that "[i]f this Court is not inclined to reduce Mark's prison sentence, then removing the leader/organizer enhancement will enable the BOP to reclassify him so that he may serve the remainder of his time in a less stressful prison environment," the Court does not believe it has the authority to grant that request. The compassionate release statute provides that "[t]he court may not modify a term of imprisonment once it has been imposed except that" under certain circumstances it "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)" or "may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure." 18 U.S.C. § 3582(c)(1)(A-B). Rule 35 only permits the Court to correct "clear error" and the Court finds no other statutory authority "expressly permit[ing]" it to remove a leadership enhancement. Moreover, even the Court did possess such authority, it would not remove the enhancement because, as it noted at

---

[7]    According to the record before the Court, Mr. Razo's last disciplinary action took place as a result of an incident on July 30, 2020. The Court hopes that the lack of any disciplinary action since July 2020 reflects Mr. Razo's greater maturity.

sentencing, Mr. Razo was a distributor to a distributor, who in turn distributed drugs to distributors, and ranked "substantially up the food chain in the calculation of where the defendant sits compared to other defendants." *Sentencing Tr.* at 104:5-13.

### C.   Closing Thoughts

Finally, the Court does not rule out future compassionate relief for Mr. Razo. The Court is very encouraged by Mr. Razo's educational progress. As the Court observed at Mr. Razo's sentencing hearing, Mr. Razo presented as a "thoughtful and intelligent young man", *Sentencing Tr.* 104:24, and, unlike his disciplinary record, his enrollment in at least fifty-one educational courses, is unusual and impressive. The Court urges Mr. Razo to exhibit more self-control and avoid incidents that lead to disciplinary blemishes on his prison record. The Court wishes Mr. Razo well and hopes he will continue progressing on his return to society as a productive and law-abiding citizen.

## V.   CONCLUSION

The Court DISMISSES without prejudice Mark Razo's Amended Motion for Compassionate Release (ECF No. 312).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of May, 2023.