UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 1:11-cr-00184-JAW-1 |
| | ) | |
| MARK RAZO | ) | |

## ORDER ON MOTION FOR SENTENCE REDUCTION AND APPOINTMENT OF COUNSEL

An incarcerated defendant moves for sentence reduction based on amendments to the United States Sentencing Guidelines which post-date his sentencing, as well as a report from the United States Sentencing Commission identifying sentencing disparities in methamphetamine convictions. In the alternative, he requests appointment of counsel to assist in bringing his claims. Concluding the cited amendments do not lower his Guidelines range and that the report does not provide a basis for his requested relief, the court dismisses the defendant's motion for sentence reduction and declines, in the alternative, to appoint counsel.

## I.    BACKGROUND

### A.    Procedural History

On October 20, 2011, a federal grand jury indicted Mark Razo on one count of unlawful use of a communication facility. *Indictment* (ECF No. 1). The indictment was subsequently revised to add two additional counts of unlawful use of a communication facility, a count of conspiracy to distribute and possess controlled substances, and a forfeiture allegation. *Second Superseding Indictment* (ECF No.

32).  After a five-day trial, a federal jury found Mr. Razo guilty of all four counts on March 1, 2013.  *Min. Entry* (ECF No. 153); *Jury Verdict* (ECF No. 158).

On September 16, 2013, the Court sentenced Mr. Razo to a term of three hundred months of incarceration, six years of supervised release, and no fine for engaging in a conspiracy to distribute controlled substances.  *J.* at 1-5 (ECF No. 199). That same day, the Court sentenced Mr. Razo to a concurrent term of forty-eight months of incarceration, one year of supervised release, and no fine for three counts of unlawful use of a communication facility.  *Id.*  The Court also imposed a total of $400 in special assessments.  *Id.* at 6.

On March 28, 2016, Mr. Razo filed a motion to vacate, set aside, or correct sentence pursuant to 18 U.S.C. § 2255.  *Mot. to Vacate, Set Aside, or Correct* (ECF No. 269) (*Def.'s First Mot.*).  However, Mr. Razo filed an unopposed motion to dismiss his § 2255 motion on March 22, 2017, *Voluntary Withdrawal of 2255 and Dismissal Without Prejudice* (ECF No. 287), which the Court granted on March 24, 2017.  *Order Granting Mot. to Dismiss 2255 Without Prejudice* (ECF No. 288).

On November 19, 2020, Mr. Razo filed a motion to reduce sentence, arguing that Amendment 782 to the United States Sentencing Guidelines should be retroactively applied to lower his recommended sentencing range.  *Mot. to Reduce Sentence* (ECF No. 296) (*Def.'s Second Mot.*).  The Court dismissed his motion on November 23, 2020.  *Order Regarding Mot. for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2)* (ECF No. 297) (*Order on Def.'s Second Mot.*).

On March 18, 2022, Mr. Razo then filed a motion for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), informing the Court that subsequent amendments to the United States Sentencing Guidelines would have reduced his sentence if they had been applied at his sentencing, that his father was murdered, and that his sister and mother were suffering from medical issues and need his care. *Mot. for Compassionate Release* (ECF No. 302) (*Def.'s Third Mot.*). After being appointed counsel, Mr. Razo amended his motion on August 8, 2022, submitting that he would no longer be deemed a career offender under Amendment 798 to the Sentencing Guidelines, that he was young at the time of his offense, that he has a network of family support, and that the statutory factors provided by 18 U.S.C. § 3553(a) support his release. *Am. Mot. for Compassionate Release* (ECF No. 312) (*Def.'s Am. Third Mot.*). On May 3, 2023, the Court dismissed Mr. Razo's amended motion, concluding that Amendment 798 did not apply retroactively and thus did not affect his Guidelines range, that Mr. Razo had otherwise failed to present extraordinary and compelling reasons, and that the 18 U.S.C. § 3553(a) did not weigh in favor of his release. *Order on Am. Mot. for Compassionate Release* (ECF No. 322) (*Order on Def.'s Am. Third Mot.*). After Mr. Razo appealed the Court's decision, *Notice of Appeal* (ECF No. 323), the First Circuit Court of Appeals found him in default for failure to file a brief and dismissed his appeal on October 18, 2023. *J.* (ECF No. 327).

On November 27, 2023, Mr. Razo again moved for sentence reduction, submitting Amendment 821 to the Sentencing Guidelines should be retroactively applied to his case and that he no longer qualifies as a career offender, and asking for

appointment of counsel. *Mot. to Reduce Sentence and to Appoint Counsel* (ECF No. 329) (*Def.'s Fourth Mot.*).

On December 21, 2023, he filed an additional motion, reiterating the basis for his motion to reduce sentence and requesting counsel, specifically asking the Court to re-appoint Attorney Jamesa Drake, who had previously assisted with his case. *Mot. to Appoint Counsel* (ECF No. 332). The Court dismissed his motion to reduce sentence on December 26, 2023, reiterating Amendment 798 regarding career offender status does not apply retroactively and concluding that Amendment 821 would not affect Mr. Razo's criminal history category or Guidelines range. *Order on Mot. for Sentence Reduction Pursuant to Amend. 821* (ECF No. 333) (*Order on Def.'s Fourth Mot.*). The Court also dismissed Mr. Razo's motions for appointment of counsel because the Court's result was "clearly mandated by law and by the guidelines and defense counsel could not affect the Court's ruling." *Id.*

## B.    Mark Razo's Pending Motion

On October 16, 2024, Mr. Razo filed a fifth motion to reduce sentence, submitting he is entitled to such a reduction for numerous reasons and requesting appointment of counsel to assist with bringing his claims. *Mot. to Reduce Sentence and to Appoint Counsel* (ECF No. 336) (*Def.'s Fifth Mot.*). In his most recent motion, Mr. Razo raises three distinct grounds for sentence reduction based on post-sentencing amendments to the Sentencing Guidelines: (1) that he no longer qualifies as a career offender; (2) that the enhancement for commission of offense while under a sentence should be removed from his sentence; and (3) that he is entitled to a two-

point reduction for drug offenders. *Id.* at 1. He adds that a study published by the United States Sentencing Commission (U.S.S.C.) concluded that the sentencing disparity between methamphetamine mixture and ice should be eliminated, and submits that "[c]ourts across the country have begun to sentence ice as meth." *Id.* at 2. As an alternative to granting his motion, Mr. Razo asks the Court to appoint counsel "to properly draft [his] argument [and] correctly file it under the proper motion category." *Id.*

The Government did not respond to Mr. Razo's most recent motion.

The Court is issuing this brief order to explain to Mr. Razo why the Court is again declining his request for sentence reduction and his request for appointed counsel.

## II.  DISCUSSION

### A.  Sentencing Guidelines Calculations

At Mr. Razo's September 16, 2013 sentencing hearing, the Court made its guideline calculations and determined that his total offense level was 42 and his criminal history category was Category VI, resulting in a guideline sentence of 360 months to life imprisonment, six years of supervised release, a fine from $25,000 to $20,000,000, and a $100 special assessment per count for a total of $400. *Statement of Reasons*, Attach. 1, *Findings Affecting Sent'g* (ECF No. 200). Under the Court's guideline calculation, Mr. Razo received a guideline enhancement of two levels under U.S.S.G. § 4A1.1(d) for having committed the instant offenses while under a criminal justice sentence. *PO Report*, Attach. 3, *Revised Presentence Investigation Rep.* ¶ 27

(ECF No. 304) (*PSR*).  The Court also determined that Mr. Razo was a career offender and that under U.S.S.G. § 4B1.1(b) his criminal history category was VI.  *Id.* ¶ 28.  As noted earlier, on September 16, 2013, the Court sentenced Mr. Razo to a term of three hundred months of incarceration, five years less than the bottom of the guideline sentence range, six years of supervised release, and no fine for engaging in a conspiracy to distribute controlled substances.  *J.* at 1-5.

### B.    Analysis

#### 1.    Motion to Reduce Sentence

Mr. Razo implicates numerous revisions to the United States Sentencing Guidelines in his motion to reduce sentence; the Court addresses each.

##### a.    Career Offender Designation

First, Mr. Razo asserts that, since his sentencing, "the qualifications for career offender changed, and [he] now no longer qualif[ies] as a [career offender] yet the [career offender] designation has not been removed." *Def.'s Fifth Mot.* at 1.  With this argument, the Court presumes Mr. Razo is referring to Amendment 798, which revised the United States Sentencing Guidelines in 2016 to limit the types of prior crimes that apply toward a defendant's career offender status.  U.S.S.G. App. C, amend. 798 (Supp. Nov. 1, 2016).  Mr. Razo had two prior convictions at the time of his sentencing: a controlled substance offense for which he had been sentenced to three years of incarceration and an evading officer against traffic offense for which he had been sentenced to sixteen months of incarceration.  PSR ¶¶ 25-26.  He has previously argued that the evading offense would no longer count as a predicate

offense for career offender status under Amendment 798.  *See, e.g.*, *Def.'s Am. Third Mot.* at 13-14.

Unfortunately for Mr. Razo, the Court has already considered this argument multiple times in his case and consistently denied his request.  *See Order on Def.'s Am. Third Mot.* at 13-14; *Order on Fourth Mot.* at 4-5.  The Court sees no reason to depart from its prior analysis, which articulated two distinct reasons why Amendment 798 does not warrant his requested relief.  First, as the Court previously wrote:

> In 2017, the First Circuit held that Amendment 798, which relaxed the range of offenses subject to career offender status, was not retroactive, and observed that "sentencing courts are not mandated to take into consideration non-retroactive substantive amendments to the Guidelines." *United States v. Wurie*, 867 F.3d 28, 35, 37 (1st Cir. 2017). Thus, Mr. Razo's career offender argument fails from the start because under First Circuit law, Amendment 798 does not apply to him since it was not in effect when he was sentenced.

*Order on Def.'s Fourth Mot.* at 4-5.

However, the Court's prior analysis of the effect of Amendment 798 did not stop there; assuming, for the sake of argument, that Mr. Razo did not qualify as a career offender under the terms of the amendment, the Court pointed out that "his guideline range would remain unchanged." *Id.* at 5. As the Court explained:

> If Mr. Razo were not a career offender, his criminal history category would decrease from VI to IV based on his eight criminal history points. . . . The guideline range for a base offense level of 42 and a criminal history category of IV is 360 months to life imprisonment, which is the same as the guideline range for a base offense level of 42 and a criminal history category of VI. In other words, even if the Court were to credit Mr. Razo's arguments about his status as a career offender, Mr. Razo's guideline range would remain unchanged.

*Id.* at 6 (citing U.S.S.G. ch. 5, pt. A (Sentencing Table)).

Under U.S.S.G. § 1B1.10, a court may not reduce a defendant's term of incarceration if the amendment "does not have the effect of lowering the defendant's applicable guideline range."  U.S.S.G. § 1B1.10(a)(2)(B).  Simply put, as Amendment 798 does not apply retroactively and, further, if it did apply, it would not have the effect of reducing Mr. Razo's sentencing guideline range, the Court is not authorized to reduce the Defendant's sentence on this basis.

### b.    Enhancement for Commission of Offense while Under Prior Sentence

Mr. Razo continues to argue that "the criminal history points have changed [and] the court has acknowledged that [h]e was enhanced 2 [points] for the commission of offense while under a sentence, however the Court refused to change this because of my [career offender] status."  *Def.'s Fifth Mot.* at 1.  Mr. Razo contends "[t]he court states that my guideline range would remain unaffected, however, that is not entirely true."  *Id.*  This argument, the Court presumes, refers to the changes to the Sentencing Guidelines made in 2023 pursuant to Amendment 821.[1]  *See* U.S.S.G. Supp. App. C., amend. 821 (2023)).

Mr. Razo is correct that, at sentencing, the Court imposed a two-level guideline enhancement under U.S.S.G. § 4A1.1(d) ("status points") for having committed the instant offenses while under a criminal justice sentence, resulting in a criminal

---

[1]    Separately, Mr. Razo asserts without explanation that, "if sentenced today . . . my criminal history would be in the level 3 category instead of where it is presently."  *Def.'s Fifth Mot.* at 2.  The Court understands this sentence to be an additional reference to the effect of Amendment 821 on his sentence.

history score of eight. *PSR* ¶ 27. As the First Circuit has explained, following Amendment 821's entry into force on November 1, 2023, "[t]he Guidelines now call for only one point in [cases where the defendant committed the instant offense while under any criminal justice sentence], and only if the defendant's criminal history points otherwise add up to seven or more." *United States v. Burgos-Balbuen*a, 113 F.4th 112, 122 n.8 (1st Cir. 2024); *accord United States v. Johnson*, No. 2:22-cr-00038-JAW-1, 2024 U.S. Dist. LEXIS 232745, at *10-11 (D. Me. Dec. 26, 2024) ("Amendment 821 . . . contained two changes: first, it eliminated U.S.S.G. § 4A1.1(d), which had increased a defendant's criminal history score by two points if the defendant committed the instant offense while under any criminal justice sentence, . . . and second, it inserted a new section, § 4A1.1(e), which served to increase the criminal history score by one point if the defendant received seven or more criminal history points and committed the offense while under a criminal justice sentence") (internal citations omitted)). The Sentencing Commission also clarified that the changes to the Sentencing Guidelines made through Amendment 821 should be applied retroactively. U.S.S.G. § 1B1.10, comment. n.7.

Mr. Razo has previously asserted this argument to request sentence reduction and the Court determined it non-meritorious. *See, e.g.*, *Order on Def.'s Fourth Mot.* at 6. The Court affirms its prior conclusion here. As previously noted, Mr. Razo's designation as Criminal History Category VI was a result of his designation as a career offender, rather than his criminal history score of eight. *PSR* ¶ 27. Because Amendment 798 is not retroactive, *Wurie*, 867 F.3d at 35, the Sentencing Guidelines

do not eliminate his career offender designation, and thus his criminal history score is irrelevant to his designation as criminal history Category VI.

Further, the Court previously considered, "for the sake of argument," the effect of eliminating Mr. Razo's career offender designation under Amendment 798 and applying the revised "status points" under Amendment 821, concluding:

> If Mr. Razo were not a career offender, his criminal history category would decrease from VI to IV based on his eight criminal history points. The new U.S.S.G. § 4A1.1(e), enacted under Amendment 821, would further decrease Mr. Razo's criminal history score by one point. But this one-point decrease would have no effect on Mr. Razo's criminal history category, which would remain at IV based on Mr. Razo's seven criminal history points. The guideline range for a base offense level of 42 and a criminal history category of IV is 360 months to life imprisonment, which is the same as the guideline range for a base offense level of 42 and a criminal history category of VI. In other words, even if the Court were to credit Mr. Razo's arguments about his status as a career offender, Mr. Razo's guideline range would remain unchanged.

*Order on Def.'s Fourth Mot.* at 6 (citing Sentencing Table).

The Court concludes its prior analysis was correct and thus it is not authorized to order Mr. Razo's sentence reduced pursuant to U.S.S.G. § 1B1.10(a)(2)(B).

### c.    Two-Point Reduction for Drug Offense

Next, Mr. Razo raises "changes to the law/guidelines, which applied to [him], such as the -2 [points] for drug offenders, but [he] wasn't able to benefit from for one reason or another." *Def.'s Fifth Mot.* at 1. Though he does not specify, the Court assumes Mr. Razo is referring to Amendment 782 to the United States Sentencing Guidelines, which took effect in 2014 and "reduce[d] base offense by two levels for each drug quantity, across all drug types." *See United States v. Worthy*, No. 2:12-cr-00135-JAW, 2023 U.S. Dist. LEXIS 169928, at *2-3 (D. Me. Sept. 25, 2023) (citing

U.S.S.G. Supp. App. C., amend. 782 (2014)).  Amendment 788, issued the same year, further made the two-point reductions pursuant to Amendment 782 retroactive.  *Id.* at *3 (citing U.S.S.G. Supp. App. C., amend. 788 (2014)).

Again, Mr. Razo previously raised this issue with the Court; in his first motion to reduce sentence, he stated he "is entitled to the two-level reduction[], under the new amendment 782, which allows for the reduction of a drug related sentence." *Def.'s Fourth Mot.* at 1.  The Court denied this request, *Order on Def.'s Fourth Mot.*, and now, upon review, reaches the same conclusion.

As noted, at sentencing the Court determined Mr. Razo's Guidelines range of 360 months to life based on a total offense level of 42 and a criminal history Category VI.  *Findings Affecting Sent'g.*  Assuming Mr. Razo qualifies for a two-point reduction pursuant to Amendment 782, Mr. Razo's Guidelines calculations of a total offense level 40 and criminal history Category VI would result in a Guidelines range of, again, 360 months to life.  *See* Sentencing Table.  As explained, under the Guidelines, a court is not authorized to reduce a defendant's term of incarceration if the proffered amendment "does not have the effect of lowering the defendant's applicable guideline range."  U.S.S.G. § 1B1.10(a)(2)(B).  The Court thus concludes Amendment 782 does not provide a cognizable basis for granting Mr. Razo's requested sentence reduction.

### d.    Reasons for Requested Reduction, Taken Cumulatively

Finally, as noted in the previous order, the First Circuit's instruction that "[s]entencing courts are not mandated to take into consideration non-retroactive substantive amendments to the Guidelines that post-date a defendant's sentencing"

did not expressly foreclose its discretion to do so, *Wurie*, 867 F.3d at 37, and therein "left the door open a crack for district courts to consider non-retroactive sentencing guideline amendments on resentencing." *Order on Def.'s Fourth Mot.* at 5. The Court thus considers whether Amendment 782, taken together with Amendments 798 and 821, could possibly result in a lower Guidelines range than was calculated at Mr. Razo's original sentencing. As explained, assuming for the sake of argument that Amendments 798 and 821 apply to his case, Mr. Razo would be subject to a base offense level of 42 and criminal history Category IV based on his seven criminal history points, and thus he would be facing a Guidelines range of 360 months to life imprisonment. *Order on Def.'s Fourth Mot.* at 6 (citing Sentencing Table). Adding the two-level reduction pursuant to Amendment 782, Mr. Razo's revised range would be calculated using a base offense level of 40 and a criminal history category of IV.

Unfortunately for Mr. Razo, for a base level of 40 and a criminal history category IV, the Guidelines still recommend a sentence of 360 months to life imprisonment, unchanged from the range applied at his original sentencing. *See* Sentencing Table. This calculation demonstrates the futility of Mr. Razo's present motion; even taking all arguments in the light most favorable to him, Mr. Razo still fails to qualify for a sentence reduction under the mandate of U.S.S.G. § 1B1.10(a)(2)(B).

### e. Sentencing Commission Study on Disparity between Meth Mixture and Ice

Mr. Razo separately asserts his sentence should be reduced because "the Sentencing Commission has concluded a study proving that nearly all meth has been

pure for the past 10 years, and as a result has concluded that the disparity between meth mixture and ice must be eliminated." *Def.'s Fifth Mot.* at 2. He adds that "[c]ourts across the country have begun to sentence ice as meth." *Id.*

The Court presumes Mr. Razo refers to the report published by the Sentencing Commission on June 13, 2024, in which it concluded defendants convicted of trafficking methamphetamine received average sentences longer than those sentenced for other drugs, such as fentanyl, heroin, or cocaine, based primarily on the sentencing structure tied to the purity of the methamphetamine involved in the offense. U.S.S.C., *Methamphetamine Trafficking Offenses in the Fed. Crim. Just. Sys.* at 2, 45-46, 52 (June 2024) (2024 Meth Rep.). The 2024 Meth Report explains that "[t]hese statutory penalties effectively produce a 10-to-1 ratio of actual methamphetamine to methamphetamine mixture, meaning it takes ten times less pure methamphetamine to trigger the same penalty than a mixture containing a detectable amount of methamphetamine," *id.* at 2, points out the "the average purity of methamphetamine samples tested increased from 57.4% in 2003 to 97.2% in the first half of 2019," and concludes [t]his has led some judges to express concern that methamphetamine purity is no longer an indication of culpability in the offense and that the varied testing practices create disparity." *Id.* at 8, 52. The 2024 Meth Report also notes that "[l]aboratory testing [for purity] was conducted in a majority of methamphetamine offenses, but the rate of testing varied across judicial circuits." *Id.* at 30, 52.

This highlighted disparity is relevant here because § 2D1.1 has five alternate base offense levels, dependent on quantity of the drug in question. For methamphetamine, the Guidelines imposed an offense level of 38 for offenses involving "[a]t least 15 KG but less than 45 KG of Methamphetamine, or at least 1.5 KG but less than 4.5 KG of Methamphetamine (actual), or at least 1.5 KG but less than 4.5 KG of 'Ice.'" U.S.S.G. § 2D1.1(c)(2). At sentencing, the Court "concluded [Mr. Razo] warranted the higher base offense level" because he "was responsible for an offense that involved 1,789 grams of pure methamphetamine." *United States v. Razo*, 782 F.3d 31, 36-37 (1st Cir. 2015), *cert. denied*, 577 U.S. 879 (2015). This determination was affirmed by the First Circuit on appeal. *Id.*

Mr. Razo's motion does not specify any legal basis for his assertion that the 2024 Meth Report justifies his requested sentence reduction. However, the First Circuit has directed courts to read pro se filings liberally. *See, e.g, Dutil v. Murphy*, 550 F.3d 154, 158 (1st Cir. 2008) ("[W]e hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects"); *accord James v. Garland*, 16 F.4th 320, 324 (1st Cir 2021). Again, unfortunately for Mr. Razo, under any of his potential legal avenues, the Court concludes Mr. Razo's citation of the 2024 Meth Report fails to justify his requested sentence reduction.

First, the Court considered whether the 2024 Meth Report constitutes grounds for sentence reduction pursuant to 18 U.S.C. § 3582(c)(2), which authorizes courts to reduce a defendant's term of imprisonment "based on a sentencing range that has

subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2). However, while the 2024 Meth Report is informative on the purity-based disparity issue, it changes neither the law nor the Sentencing Guidelines so as to support a sentence reduction pursuant to § 3582(c)(2). Nor have any related legislative changes to the Sentencing Guidelines or governing statutes been promulgated by Congress or the Sentencing Commission. The Court therefore concludes that there has been no intervening change of law that would justify a reduction to Mr. Razo's sentence pursuant to 18 U.S.C. § 3582(c)(2). *Cf. United States v. Bradley*, No. 1:17-cr-9-HSO-RHW-1, 2024 U.S. Dist. LEXIS 25631, at *4-5 (S.D. Miss. Feb. 14, 2024) (concluding decisions by other district courts are not intervening changes in law for the purposes of 18 U.S.C. § 3582(c)(2)) (citing *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)).

Even without an official change to the law or Guidelines, Mr. Razo contends "courts across the country have begun to sentence ice as meth." *Def.'s Fifth Mot.* at 2. Presumably because of his pro se status, he has not cited any caselaw supporting his position, and the Court therefore looked into the question independently. Its research reveals some other federal courts have indeed expressed policy disagreements with the 10:1 ratio contemplated by the Guidelines and have chosen to categorically apply the lower mixed methamphetamine penalty, regardless of purity. *See, e.g., United States v. Saldana*, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790, at *11 (W.D. Mich. July 3, 2018) ("This Court's methodology for sentencing in methamphetamine cases will be to treat all methamphetamine quantities as mixtures"); *United States v. Celestin*, No. 21-125, 2023 U.S. Dist. LEXIS 25406, at

*15-16 (E.D. La. Feb. 15, 2023) ("The Court will apply the methamphetamine mixture Guidelines to all methamphetamine cases moving forward, regardless of whether the defendant requests the Court do so").

More often, however, courts expressing disagreement with the 10:1 sentencing ratio have exercised their discretion to consider the sentencing disparity between an actual and mixed meth sentence in light of the specific defendant's circumstances to reach an appropriate term of sentence. *See, e.g.*, *United States v. Bean*, 371 F. Supp. 3d 46, 55-56 (D.N.H. 2019) ("the court will use the following sentencing methodology in all actual methamphetamine and ice cases: (1) calculate the guidelines sentencing range using the purity-driven methamphetamine guidelines; (2) recalculate the guidelines using the base offense level for the same quantity of methamphetamine mixture; and (3) evaluate whether any upward or downward variances are appropriate based upon the individual characteristics of the defendant and the other § 3553(a) factors"); *United States v. Nawanna*, 321 F. Supp. 3d 943, 956 (N.D. Iowa 2018) ("I will calculate the Guidelines range under the existing Guidelines, and then I will calculate an alternative Guidelines range based on a one third reduction. Next, I will either use or vary from that alternative Guidelines range depending upon my consideration of the 18 U.S.C. § 3553(a) factors") (quoting *United States v. Hayes*, 948 F. Supp. 2d 1009, 1031 (N.D. Iowa 2013)).

As a threshold matter, this Court declines to exercise its right to a categorical *Kimbrough*[2] policy disagreement with the 10:1 ratio articulated in the Sentencing

---

[2]      *Kimbrough v. United States*, 552 U.S. 85, 96, (2007).

Guidelines. That is not to say the higher ratio should be strictly applied to all defendants; as other federal courts have explained, "[d]ue to increases in the average purity of methamphetamine sold today, purity is no longer an accurate indicator of a defendant's culpability or role in a drug enterprise." *United States v. Hendricks*, 307 F. Supp. 3d 1104, 1105 (D. Idaho 2018).

However, the higher penalties assigned to actual meth and ice under the Guidelines were not assigned on assumptions of culpability alone. The greater the purity, the greater the potency. Thus, a drug's increased purity also logically generates a powerful effect on the user, a greater risk of addiction and overdose, and a corresponding increase in the community harms, all especially concerning for methamphetamine. *See, e.g.*, Kelley E. Courtney et al., *Methamphetamine: An Update on Epidemiology, Pharmacology, Clinical Phenomenology, and Treatment Literature*, Nat'l Libr. of Med., https://pmc.ncbi.nlm.nih.gov/articles/PMC4164186/ (last visited Jan. 28, 2025) ("crystalline methamphetamine is associated with an increased incidence of dependence, as compared to the lower purity forms"); *Methamphetamine*, Nat'l Inst. on Drug Abuse, https://nida.nih.gov/research-topics/methamphetamine#long-term (last visited Jan. 28, 2025) ("Methamphetamine is a drug with a high potential to become addictive . . .. In recent years, nearly two out of three people aged 26 and older who reported past-year methamphetamine use met criteria for a substance use disorder" and "[r]esearch from the U.S. Centers for Disease Control and Prevention (CDC) shows that methamphetamine is the second most commonly found drug in people who fatally overdose"); *Crystalline*

17

*Methamphetamine Fast Facts*, U.S. Dep't of Just., https://www.justice.gov/archive/ndic/pubs5/5049/5049p.pdf (last visited Jan. 28, 2025) ("Crystal methamphetamine, however, typically has a higher purity level and may produce even longer-lasting and more intense physiological effects than the powdered form of the drug").

Further, the 2024 Meth Report is clear that crimes involving the purer forms of meth are only increasing in frequency, despite severe penalties. Since 1998, methamphetamine cases have increased 317% and, as of 2022, accounted for 48.7% of all federal drug trafficking offenses. 2024 Meth Report at 16, 17. Notably, this dramatic increase has been driven largely by growth in the purer forms of meth. While meth mixture offenses increased only 16% between 2002 and 2022, actual meth offenses increased 299% and ice offenses increased a staggering 881% over the same period. 2024 Meth Report at 18. Based on this increase, the Court is perplexed as to why the significantly increasing purity of meth and its demonstrable ill effects should lead the Court to categorically apply lower meth ratios to higher meth purity. The Court understands that applying a higher meth ratio to a mere transporter of meth, particularly a person who is only doing what he/she is told to do and has no control over the product's purity, is a powerful argument in favor of using the mixed meth ratio in that case. But conversely, if the defendant is higher in the drug-dealing pyramid, depending on the evidence, it may well be appropriate to apply the higher meth ratio to someone more culpable for the resultant harm. As the Court has described it, the application of the proper ratio depends upon the facts in each case.

The Court concludes a categorical shift to imposing the mixed meth penalties to all meth cases would not serve the criminal sentencing purposes as articulated in 18 U.S.C. § 3553(a) of promoting respect for the law, affording adequate deterrence, and protecting the public, and thus declines to categorically disagree with the Guidelines based on the 10:1 ratio it assigns to purer forms of meth. *Accord United States v. Kaufman*, No. 2:18-cr-00036-GZS, 2019 U.S. Dist. LEXIS 118725, at *6-8 (D. Me. July 17, 2019) (in response to similar arguments, concluding "the Court views purity as a reasonable proxy for the danger of the methamphetamine he possessed and attempted to possess, as well as for the relative amount of methamphetamine he would have been able to distribute into the community" and "in the Court's view, the Guidelines reflect the harsh societal harms caused by the production, distribution, and use of pure methamphetamine  as well as a legislative desire to address these harms with significant penalties").

Instead of a categorical disagreement, the Court concludes that these and the other purposes of sentencing in 18 U.S.C. § 3553(a) are better served by considering an individual defendant's circumstances, history, and the nature of the offense on a case-by-case basis to determine whether the heightened penalties would provide just punishment for the offense.  This case-by-case approach is consistent with the precedent of this District, which has considered departing downward from the heightened penalties through case-specific analysis under 18 U.S.C. § 3553(a) rather than a categorical *Kimbrough* disagreement.  *See, e.g.*, *Kaufman*, 2019 U.S. Dist. LEXIS 118725, at *8 ("While the Court is announcing that it does not intend to vary

based on a categorical disagreement, nothing in this Order is meant to suggest that the Court may not consider a variant sentence based upon its full consideration of all of the 3553(a) factors at sentencing"); *accord United States v. Arris*, 2:23-cr-00138-NT, *Statement of Reasons* (ECF No. 48) at 4 (in a meth distribution case, departing downward pursuant to 18 U.S.C. § 3553(a) "based upon its finding that the drug conversion factor for methamphetamine (actual) appeared overly punitive in this case"); *United States v. Rodden*, 2:23-cr-00079-NT, *Statement of Reasons* (ECF No. 50) (noting its consideration of the 2024 Meth Report and concluding "that a downward variance of two levels is warranted based upon parity and fairness").

Returning to Mr. Razo's case, the Court concludes he does not present circumstances warranting a downward departure to the mixed meth penalties for two fundamental reasons. First, as explained by the 2024 Meth Report, experts with the Drug Enforcement Administration attribute the dramatic increase in the average purity of methamphetamine in this country to "super laboratories" operated by Mexican Transcontinental Criminal Organizations, which gave rise to an equally dramatic increase in the number of overdose deaths involving psychostimulants from 1,390 in 2011 to 32,537 in 2021. 2024 Meth Report at 6, 11. In the decade prior to 2011, the number of overdose deaths had remained relatively stable. *Id.* at 6. This timing is significant to Mr. Razo, who was convicted of, inter alia, conspiracy to distribute methamphetamine from April through August of 2011. *Second Superseding Indictment* at 1-2. Mr. Razo's conviction and sentencing thus reflected the then contemporaneous circumstances when higher purity forms of

methamphetamine were less available and therefore properly imputed higher culpability; the Court declines to reduce his sentence based on developments subsequent to his conviction in which he took no part.

Second, as the 2024 Meth Report explains, the 10:1 ratio for pure meth was developed to reflect "[i]ndividuals trafficking highly pure methamphetamine have been presumed to be higher up in the chain of distribution." 2024 Meth Report at 39. However, as the report highlights, data reveals "there were no statistically significant differences in the purity of methamphetamine based on the function of the individual drug trafficker." *Id.* This conflict between policy design and reality may provide a basis to impose a more lenient sentence against certain low-level drug offenders, such as couriers, who do not control the purity of the methamphetamine they carry.

It does not apply to Mr. Razo, though, for several reasons. First, as the First Circuit pointed out, the issue of the purity of the meth involved in his case was presented to and decided by the jury. *Razo*, 782 F.3d at 34. The First Circuit observed that the state chemist Amy Johnson testified about her analysis of the meth in Mr. Razo's case and stated that it was "pure methamphetamine." *Id.* The First Circuit wrote that Ms. Johnson's "testimony about the methamphetamine's purity was key to the jury's finding that the conspiracy involved 50 grams of pure methamphetamine." *Id.*

Next, as the First Circuit pointed out, Mr. Razo "was incarcerated in California for the duration of the conspiracy." *Id.* at 41. While in California state prison, Mr. Razo "used a contraband cell phone to coordinate a trafficking operation with his co-

conspirator Barry Diaz." *Id.* at 42.  Mr. Diaz was not incarcerated at the time, and at the sentencing hearing, the Court discussed its finding that Mr. Diaz himself was "one or two people beyond the actual end user." *Tr. of Proceedings* at 40:21-25 (ECF No. 234) (*Sentencing Tr.*).  The Court also concluded that Mr. Razo was "above Mr. Diaz", *id.* at 41:1, "higher up the pyramid in the drug trafficking conspiracy than Mr. Diaz himself." *Id.* at 41:4-7.  Moreover, the drug trafficking conspiracy in Mr. Razo's case was extensive.  The two of them discussed distributing cocaine, methamphetamine, heroin, and marijuana in Maine, Iowa, Arizona, Connecticut, and California.  *PSR* ¶ 7.  Based on these facts, the Court found at sentencing that Mr. Razo was an organizer of a criminal enterprise and imposed a four-level enhancement under § 3B1.1(a).  *Sentencing Tr.* at 41:18-20.

With this understanding, the Court concludes first that, given the circumstances of his crime, Mr. Razo is a person whose conduct merited the higher purity meth ratio.  Mr. Razo was neither a transporter nor a street dealer.  He was an organizer at least two steps up the drug trafficking pyramid, and therefore to the extent purity is a proxy for culpability, Mr. Razo meets the underlying rationale for holding more significant drug dealers responsible for the purity of their product.  Also, as noted earlier, Mr. Razo was dealing methamphetamine before the more recent growth of Mexican meth labs and the associated national phenomenon of markedly enhanced methamphetamine purity.

The Court next considered Mr. Razo's argument as a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), which permits courts to reduce a term

of imprisonment for "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).  However, seeking such relief requires a defendant to have first "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  *Id.*; *see also United States v. Cain*, No. 1:16-cr-00103-JAW-1, 2021 U.S. Dist. LEXIS 20672 (D. Me. Feb. 3, 2021) ("the § 3582(c)(1)(A) exhaustion requirement is motion specific; a prisoner must demonstrate renewed compliance with the requirement with each successive compassionate release motion he files").  Mr. Razo has presented no evidence in this case, and the Court is otherwise aware of none, suggesting that he presented his arguments regarding the 2024 Meth Report to the Warden of his facility before filing his present motion in court.  Construed as a 18 U.S.C. § 3582(c)(1)(A) motion, Mr. Razo's request thus fails at the administrative exhaustion stage.[3]

Finally, Mr. Razo's motion could potentially be interpreted as a motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255 as "in excess of the maximum authorized by law, or [] otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  However, this recourse similarly fails for procedural reasons before

---

[3]      Though it does not reach the merits of Mr. Razo's claim, the Court notes that other federal courts presented with the purity-based disparity of methamphetamine sentencing guidelines have concluded this does not constitute an "extraordinary and compelling reason" within the meaning of the statute.  *See, e.g.*, *United States v. Lopez-Martinez*, No. 8:19-cr-407, 2023 U.S. Dist. LEXIS 51821, at *4 (D. Neb. Mar. 24, 2023) ("Lopez-Martinez's sole point is that he believes that the guidelines are too harsh in its treatment of methamphetamine (actual).  This is not an 'extraordinary and compelling' reason for a reduction in sentence"); *United States v. Van Doan*, No. 14-cr-225, 2023 U.S. Dist. LEXIS 190225, at *6-8 (S.D. Cal. Oct. 23, 2023) ("the Sentencing Commission's distinction between pure methamphetamine and methamphetamine mixture is not an extraordinary and compelling reason to reduce Defendant's sentence").

getting out of the gate, as longstanding and authoritative precedent makes clear that petitions for habeas corpus under this statute may only be brought in the federal district of confinement, not the district where sentence was imposed.  *See, e.g.*, *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004); *McKinney v. United States*, No. 1:18-cr-00084-JAW-3, 2022 U.S. Dist. LEXIS 100068, at *4-5 (D. Me. June 6, 2022).  Based on the return address of the envelope enclosing the present motion, and confirmed on the Bureau of Prison's database, Mr. Razo is presently confined at FCI Ray Brook in Ray Brook, New York.  *See Def.'s Fifth Mot.*, Attach. 1, *Envelope*; Federal BOP Inmate Locator, https://www.bop.gov/inmateloc// (last visited Jan. 28, 2025).  As Ray Brook, New York is within the federal Northern District of New York, the District of Maine lacks jurisdiction to review a habeas petition on behalf of a person confined in that district pursuant to 28 U.S.C. § 2255.

With these three potential avenues each foreclosed to Mr. Razo for the reasons described, the Court concludes the issues described in the 2024 Meth Report do not provide any cognizable basis for granting his motion for sentence reduction.

### 2.    Motion to Appoint Counsel

The Court also rejects Mr. Razo's motion for appointment of counsel because the result the Court has reached on this motion is clearly mandated by law and by the Guidelines, such that defense counsel could not affect the Court's ruling.

In *United States v. Mala*, the First Circuit applied a three-part standard for when appointment of counsel is warranted: "(1) appellant has shown a fair likelihood of success on the constitutional claim, (2) that claim is  factually complex and legally

intricate, and (3) the facts are largely undeveloped and appellant (who is both incarcerated and indigent) is severely hampered in his ability to investigate them." 7 F.3d 1058, 1063-64 (1st Cir. 1993). In the District of Maine, this standard has been applied to defendants' requests for appointment of counsel in the context of requests to reduce sentence. *See, e.g.*, *United States v. Doody*, No. 1:19-cr-00134-LEW, 2022 U.S. Dist. LEXIS 196266, at *2 (D. Me. Oct. 28, 2022); *United States v. Morris*, No. 2:16-cr-00002-DBH, 2020 U.S. Dist. LEXIS 141101, at *4 (D. Me. Aug. 7, 2020).

In the case at bar, as discussed, the Court concludes Mr. Razo's claims are not likely to succeed on the merits, nor do they present a factually complex, legally complicated, or undeveloped record. Appointment of counsel is thus unwarranted, and the Court declines the Defendant's request.

## III.  CONCLUSION

The Court DISMISSES without prejudice the Defendant's Motion to Reduce Sentence and to Appoint Counsel (ECF No. 336).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 4th day of April, 2025

25